Good afternoon, Your Honours, and may it please the Court, I am Thomas Masucci. I represent  by the U.S. Department of Justice, and it's been handled by the U.S. Department of Justice in a fairly explicit and detailed manner. The problems we have with the way the agency handled this case. Well, I think, as I understand it, the I.J. said that there was an absence of any evidence of arrest, torture, or persecution, and that there just was not enough direct harm to her that she would be able to qualify. Well, Your Honour, she doesn't need to show any evidence of direct harm, torture, or persecution. She needs to show a well-founded fear. I believe she does. I mean, the Board, assuming her credibility, indicated that it was just, her against her. Well, yes, but, and we addressed that as well in our brief, and I'd be happy to discuss it this afternoon. But just for the moment, I would like to focus on the Board's finding that, assuming that she's credible, that the testimony is too vague. My question to the Board, and I guess to the Government, is what was vague about it? And as we point out in our brief, starting at the bottom of page 19, this is Lee's testimony. A few public security officers came to my house one night. They claimed that some people reported to them that I had been involved with the Falun Gong, so they came to arrest me. Lee's mother, we say Lee's mother was the only one at home, so she called Lee and told her, quote, not to go back because the public security had visited their house and they wanted to interrogate her. And apparently the public security indicated that, to the mother, that they wanted Lee to come back for the interrogation. We would hold that, again, going with the Board, assuming that this is credible evidence, credible testimony, she's met her murder. I didn't understand that, I guess it was the immigration judge, I don't know if the BIA mentioned it. They're concerned about hearsay, and I've not really seen that pop up in the BIA petition for review from the BIA before, and I'm not sure, maybe I should ask Ms. Fry about it, but I'm not sure I understood the nature of the concern. One, it is not technically hearsay insofar as the well-plugged fear of future persecution is concerned, but I assumed it was put in there because of a concern about reliability, and she wasn't there to hear the statement, therefore it's not reliable, and that's the context in which it was used. But if she were there, she would have been arrested, so I don't quite understand that. Well, as I'm sure your honors know, hearsay is allowed in these proceedings. I mean, there's no question that... They're full of hearsay. They're full of hearsay. They're all based on hearsay. Why the IJ played the hearsay card with regards to these two letters from parents and a fellow fallen gun practitioner, I think really... Was that the hearsay? It wasn't the mother telling her what happened while she was away? It was about... Same question, but was that where the hearsay concern was? Well, I guess it was both the mother telling her and also the letter where the mother explains what happened and explains that she told the daughter and so on. But with regard to the testimony that she has shown, again, assuming that this is this credible testimony, she's shown that the Chinese government has an interest in her on account of one of the enumerated grounds. And based upon the background that we go over the top in citing from the country report, the Chinese government pulls no truck with anyone who's even remotely associated with fallen gun. So to say that the credible evidence about police wanting to arrest her does not give her an objective and a subjective basis for having a well-founded fear, to me it's baffling. The one point that the IJ makes, I think, to anchor his negative credibility finding on is this omission from the testimony regarding her loss of employment. First of all, it's very interesting that the IJ... This issue never came up during the hearing. And I know in the Second Circuit, there was case law just from last year, Ming The judge has an obligation, consistent with board precedent, to bring this to the person's attention during the hearing. The board says an omission or an inconsistency can go to credibility, but the person has to have an opportunity to explain it. And the Second Circuit has gone one step further and said, well, this means that it has to be brought to the attention. And I know neither this court nor any of the other circuits have spoken to it, but I just would raise the point that this did not come up during direct, it didn't come up during cross, it was just mentioned in the decision. Interestingly, though, the judge, as I think we try to hammer home in our brief, is really making a mountain out of a molehill. I mean, the government in its brief says that this loss of employment is the one adverse thing that happened to the petitioner, and so therefore it's completely inconceivable that she would not mention this during the hearing. I think an objective review of the record shows that that's just not the case. The judge in his decision, this is page 50 of the administrative record, says there's two elements of persecution that she's alleging in her written application. One is the threat of the rest, and the second is losing her job. She testified today about the threat of being arrested, but she provided no testimony whatsoever here today. And here the judge is kind of, I think, searching for a way to describe what it is that he would have wanted about the prospect of losing her job, or the act of losing her job. I'm not really sure what that means, or how that happened. There's no indication that she had any of that information in terms of how it happened. However, an objective and sober review of the I-589, the asylum application, it shows that the focus of the respondent was on the threat of the rest, as I think it should be, given what the record is with regard to the Chinese government handling of this. In her I-589, on page 239 of the record, question, why are you seeking asylum? Explain in detail what the basis is for your claim. And she says, the government wanted to arrest me for practicing Falun Gong. See my attachments. Have you ever belonged to any association? Yes, I was a Falun Gong practitioner. Have any members of your family ever been mistreated or threatened by the authorities of your home country? And she said, the police wanted to arrest me for practicing Falun Gong. Again, the clear emphasis here is the arrest, and I think it's reasonable. The mention of the loss of employment is literally one sentence at the very, very tail end of the narrative describing what had occurred in China. So to me, it kind of, it stretches my sensibility in terms of trying to understand how this purported omission can really be said to be either material or maybe even really existent. I mean, it's existent in some technical sense. It's existent in the record, but I don't really think it's there. Just another aside with regard to this apparent insistence by the judge that there would be some sort of rigid consistency between the statement and the testimony. The judge basically dismissed the letters that were submitted from the Falun Gong practitioners to their parents because they were too similar to the claim. So it's really a catch-22. On the one hand, the judge is saying, I'm not going to admit this evidence or consider this evidence to be legitimate because it's just, it doesn't tell me anything that I already don't know from... Right. Well, the judge, apparently the IJ wanted, he wanted a novella apparently from these people about what they were smelling and what they were seeing and what they were feeling. And these are probably, I'm guessing, farmers with three or four years of elementary school education. And to expect that they're going to give a masterful account of what they're smelling and what they're feeling. And to really, as we say, play gotcha with this omission of the loss of employment is disingenuous and I... Good. Well, we'll have you back on the line. Okay. Let's hear from the governor. Excuse me. May I ask a question? Yes, of course. Supposedly family credibility evaluation was not sustained by the evidence. What evidence is there that she would be persecuted in China if she returned? I know that Falun Gong is sporadically persecuted, but why would she be persecuted? Well, Your Honor, I would first argue that the evidence, certainly in the record that we highlight in our brief, shows that the persecution of Falun Gong has, in the last few years, become much more routine, much more strict, and much more draconian in terms of the nature of the penalties and punishments. With regard to this particular respondent, though, besides the generalized fear, I mean, the fact is that she is already on someone's list as a Falun Gong practitioner and or supporter. And that increases, as I said earlier, that and also the subjective fear that she has. Well, as I understand the country, the LPM that we have, the country report, and the country report, sometimes the government does bad things to the country, but sometimes... We're having trouble hearing you. I know you talked about the country report. As I understand the country report, the government sometimes does bad things to the Falun Gong, but that sometimes... No, I'm sorry, we lost you again, John. The country report says sometimes Falun Gong is persecuted, but it's sometimes done Yeah, I think that if I'm hearing you correctly, you're saying that the country report reveals that sometimes they are persecuted, but not in every situation, and how can we be sure? But what is the evidence that in this case, if she returned, that she would be... she has a well-founded fear of future... If you put it more precisely, what are the chances in terms of a percentage... I'm sorry, what are the chances? What are the chances in terms of a percentage? Of a percentage, you mean? Yeah, what's the percentage probability? Well, I would certainly say it's more than 10%, which is what the Supreme Court requires in cases like this, but respectfully, Your Honor, my reading of the country report regarding Falun Gong is that the Chinese government is much more consistently ruthless in dealing with Falun Gong than, say, with the family planning policy. The evidence that we... the passage that we cite from the bottom of page 20 to the top of page 22 of our brief, I think, gives a sense of the way the Chinese government views this, and I would say, again, given the petitioner's pedigree and history, that she certainly has more than a 10% chance of being persecuted in the future. Well, can I continue this dialogue? The bottom of 20 is saying 50 people died at custody. Well, that was a tiny number of total people arrested. I'd say that was even a 10% possibility. Well, that's correct, Your Honor, but that's referring to one incident in 1999. The report goes on to talk about the police often using excessive force when detaining peaceful Falun Gong protesters, Falun Gong petitioners continuing their efforts to overcome government attempts to restrict the right of free assembly. Government initiated a comprehensive effort to round up practitioners not already in custody. I would respectfully hold, Your Honor, that the... Certainly, we can't argue reasonably that there's a certainty or maybe even a likelihood that she would be arrested, but I certainly think there's a low amount of fear. Good. Mr. Masucci, thank you very much. Ms. Frey? Good afternoon, Your Honors. May it please the Court, I'm Mary Catherine Frey, and I represent the government. And am I speaking loud enough? Yes, you are. Thank you. I would like to begin by just reminding the Court that the issue that's before the Court today is whether the BIA's finding that the petitioner failed to carry her burden of proving past persecution or a well-founded fear of future persecution was supported by substantial evidence. Or put another way, is the evidence on her side so compelling that no reasonable fact finder could have found the way the BIA did? And I want to throw that out at first because I want to discuss some of the specific issues that Your Honors brought up in that context. First of all, as to Judge Newman's question, I don't have a percentage either, but the administrative record in this case contains the country reports, and at page 143 of the administrative record, it gives estimates of the number of Fang Gong practitioners in China as of the date, which this would have been in 2003, of the report. At that time, the low estimate was a million. So if you look at the numbers that are cited in that report, such as the 50 individuals that supposedly died in custody, this is a very small percentage that we're talking about. But I can't give you a specific percentage, but it is addressed generally in the country report. But that's saying there are a million practitioners, and of that million in that country report, 50 died in custody? Yes, but there are also statements about estimates of the numbers detained and so on. I'm just trying to give you a ballpark idea of what the numbers in the country report look like. Okay, I want to make sure I follow you on those numbers. You're saying the million figure are the number of practitioners, and the 50 are of those million, the number that died in custody? I don't know that that's the total number. That's the number that is cited in my opponent's brief and so on. I also wanted to come back to Judge McKee's question on hearsay. Clearly, you're absolutely correct that these decisions are always full of hearsay. That in and of itself is not a reason to ignore the evidence. I think what the IJ was getting at was that the fact that the only thing that actually happened to this petitioner was the police coming to her house and her being told about it by her mother, being one step removed from the petitioner, simply made the whole issue of whether there was any evidence more troubling to him. I don't think he was— But why would it, though? We never have required her actually submitting to an arrest and then trying to break out of jail and come here. Well, I'm sorry. Why would that be troubling? I think the reason that it's troubling is if you go back and you look at the mother's letter, which is—I'm sorry. It's in the administrative record. It is not in the appendix. It's in the administrative record at page 126. The mother does not state that they tried to arrest her. The mother states that— She states, Which we can still remember it was an evening at the end of February. Two police suddenly came to our house to look for Mie Chai. They wanted to detain her for interrogation. Mie Chai was coincidentally working on her work site and was not at home. The police said that they had received a report from a neighbor. The police told us to surrender Mie Chai voluntarily to accept interrogations. That's not quite the same as coming to arrest her. This is not a democratic society they were talking about. Correct. Two police officers come to someone's house looking for the daughter, and they tell the mother, You want to interrogate—I don't know if that were me. I'm trying to put myself in their shoes. Someone tells me that two police officers came to my house to interrogate me, and in this context of the Chinese government and the kind of repression that can occur there, and they said, We want her to submit for interrogation. I would not need a second invitation or a second visit. I'd be out of there. I wouldn't like it either, Your Honor. What I'm trying to explain here is the fact that we have this step removed from the petitioner. It means that I think that the IJ's problem was it wasn't really clear exactly what had happened. We have the mother's version. We have the petitioner's version, which is they showed up to arrest me. You may want to make that assumption. Maybe you can help me in this part. Sometimes we look at these, and I was lucky to see that the immigration judge wasn't. Sometimes, at least for my own part, we haven't discussed this, and I hope I'm not being unfair, but sometimes in reading the briefs, the only way to fit it all together is if the immigration judge began the proceeding with the intent of not granting relief from removal. If that's the intent, then it all makes sense to me. This all makes sense. The inquiry makes sense. Looking at that kind of nitpicking, not your nitpicking, Robert Yarford talking about the way the IJ's decision was laid out, that makes a lot of sense to me if the IJ goes into it not with the intent of trying to find out, do we have past persecution? Do we have a well-founded fear of future persecution? But if you're looking to throw darts in the story and put little holes in there, then you can say, well, what she says is not what the mother said. It's all hearsay. I don't find it very credible. It's all vague. But from the point of view of an objective observer, all she knows is someone came to arrest her, and that's what she said. The mother has a little more detail. They may not have told her all the detail. The mother knows two people came to the house looking for her daughter and asking that the daughter be surrendered, basically surrendered herself for interrogation. That would sure put a well-founded fear. It would put a fear in me. We can argue about whether or not it's well-founded. I think the problem with what happened here, Your Honor, is that it may put a well-founded fear of something in you. The question is, does it put a well-founded fear of persecution? What about arrest based upon religious beliefs? Would that be enough? You'd have to not, I mean, I can't answer that in and of itself without more factual. The definition of torture is, I'm sorry, persecution. Okay, okay. Forgive me. The definition of persecution is threats to life, confinement, torture, or economic restrictions so severe that they constitute a threat to life or freedom. Okay, so you're saying that imprisonment is not great and we don't condone it, but it's not enough relief from the disability statute. It may be or it may not be. But what I think is really going on here, and I do understand Your Honor's reaction to this particular IJ's opinion. Please bear in mind it was an oral opinion. Unfortunately, because of what you called nitpicking, and I would agree with that, it's very easy to go off on some tangents that really are not central to what the decision was. And I think that the BIA tried to correct that by coming back and saying, even assuming that she was credible, she still didn't carry her burden. And so if you bear with me a minute, let me just tell you what the evidence was. Let me just remind you of what the evidence was. The petitioner said that she started practicing Falun Gong. I'm sorry, Falun Gong. Right. In August of 2000, practicing in secret. In February of 2001, while she was at work, two policemen appeared at her parents' door and asked to have her surrendered for interrogation. Her mother called her terrified. She immediately left, went into hiding, and came to the United States. I'm not suggesting that that would be a pleasant experience to go through. But nothing so far is persecution, because nothing actually happened to her. She was frightened, but under the definition of torture, nothing actually has happened yet. So the question becomes, is there evidence in this record to support a finding of a well-founded fear of future persecution? And, in fact, the real question today is, is there so much evidence of a well-founded fear of future persecution that the BIA had to be wrong and you have to reverse them? The evidence that's in the record that would suggest a well-founded fear of persecution is really limited to the country report. The country report, again, did indicate that there is some mistreatment of Falun Gong practitioners in China. If you look at the actual language of the report, and it begins in the administrative record at page 236, there are specific references—I'm sorry, I think I've got that wrong. Let me correct that one. The country report begins at page 143. There are specific references to the leaders of the Falun Gong movement being prosecuted and of the individuals who participate in the mass demonstrations and so on. There's no evidence in this record that Ms. Li was a leader. To the contrary, she said herself that she practiced for only six months, and she practiced in secret. In addition, the two letters that she did submit, which the IJ did not put too much weight on, one was from her mother, who outlined the two policemen coming. But if you look at that letter, you'll notice what is not in the letter. There's nothing in that letter indicating that the policemen ever came back. This was in February 2001. The letter was written in 2003. No indication they came back. No indication they followed her to her work site. No indication that they arrested or in any way mistreated the parents. It was a single incident as far as the evidence shows. In addition, Ms. Li submitted a letter from the friend who introduced her to Falun Gong. If you look at that letter, which is in the administrative record at page 136, that person is still practicing Falun Gong at the same Falun Gong practice station that they used back when Ms. Li was in China. He has been detained and interrogated, but he has never been sent to a re-education center or mistreated. At least he doesn't say so, but he has been. Again, as of November of 2003, he was still a Falun Gong practitioner. This suggests to me that whatever interest there was in this young woman, it was a one-time deal. The evidence that she has submitted actually undercuts her argument that if she goes back, it's now been six years, six years later, she is going to be subject to persecution. But the issue today is not whether, obviously, it's not whether if we were making this decision right now, how would we evaluate the evidence. The issue today is whether there was substantial evidence to support the BIA's finding that she did not carry her burden. I don't think that the government is being nitpicking about this. What about the economic aspect? I'm sorry? What about the economic aspect of this job? Well, unfortunately, there is so little evidence, she presented so little evidence, I don't think there is any basis for even making a finding on that. The mother's letter states she lost her job. In her asylum application, she states that she lost her job. She did not bring it up at the hearing. In none of those, although it has been stated, I think in the briefs, that she lost her job because of Falun Gong. I believe the mother said she lost it because of her practice of Falun Gong. But there is, that's it. There's nothing else on the record to indicate the circumstances. We know that she said that she immediately went into hiding, which might suggest that that's why she lost her job. She fled to a different city and then she came to the United States. So there's really nothing there. There's not enough there to determine that she couldn't get a job when she went back. There certainly is no evidence to suggest that. So it really, the problem here is the lack of evidence. And unfortunately, because the IJ spent so much time on the issue of credibility, it kind of gives us a lot of red herrings to worry about. But I think that even if you assume that everything that Ms. Lee said is true, she still hasn't carried her burden. Yes, Your Honor. John, we're not hearing you. No, we're still not getting you. No, I'm afraid not. Our technician said it was on your hand. We heard that last part. Oh, yes, Your Honor. I think the credibility issue was crucial for the IJ, and he did not develop the testimony. Well, I think the credibility issue was important to the IJ, but unfortunately, I don't think that it's necessary for this Court's decision. Are you conceding the credibility issue? No, Your Honor, I'm not. What I'm suggesting is that it's not necessary that the Court reach it. I'm sorry? How do you deal with the fact that the IJ has a duty to develop the testimony? I guess, reading the opinion, I think that the IJ did develop the testimony. Perhaps not to the extent that he should have. But particularly when the IJ has decided, believes that the testimony is not credible, I guess I'm not sure how far he has to go to re-implicate.  No. Good. Anything else? Well, yes. Can I make one more point? Yes. I think that really what this case comes down to is that the petitioner is really arguing that this Court should find that there's a pattern or practice of persecution against Falun Gong practitioners in China. No Court has found that to date. And in fact, this Court has recently denied petitions filed on the part of Falun Gong practitioners based upon the same type of credibility and burden of proof issues that are raised today. So I think that what this really comes down to is, did she present enough evidence to prove that she had a well-founded fear of future persecution? And I think that both the IJ and the BIA not only found that she did not carry that burden, but that there is sufficient evidence in this record to sustain that. And therefore, the Court should deny the petition. Good. Thank you, Ms. Frey. Ms. Masucci? Well, Your Honor, respectfully, our position is that both the IJ and the Board ignored the overwhelming substantial evidence in the record showing that there is a pattern or practice of persecuting Falun Gong members in China. I remember Ms. Frey's point that what we have here, taking off her testimony at his face, is the less even say the likelihood, the probability that she may have been arrested and interrogated. And I don't mean interrogated in the marathon man sense. I mean it in terms of being asked questions, and that's it. And then her argument is, good argument, that the police never went back. There's nothing to suggest that they had singled her out in any way, so that even if we accept what Ms. Li said, although it might establish that she has a fear of being arrested, it doesn't rise to the level of a well-founded fear of persecution, making that distinction. Well, first of all, Your Honor, there are actually two State Department reports in the record. My colleague referred to the one beginning at page 142, which is actually the International Religious Freedom Report. The Human Rights Report begins on page 161. It paints a very different picture, first, of the more generic persecution of Falun Gong practitioners in China. Secondly, it paints a very stark picture of police and prison practices in China. One could, I think, say with a completely straight face that given the animus that the Chinese government has against Falun Gong, and given the way the Chinese prison bureaucracy works, given the fact that the country report says that there's a 90% conviction rate in criminal matters in China, there is a well-founded fear. You're moving away from pleading a case on behalf of your client to pleading a case for all Falun Gong members, it seems to me. Am I correct on that? Well, if what you say, if that's the determining factor, then we've pretty much, all the members of, all the practitioners would have a very good basis for asylum here. Well, Your Honor, I would say... And that may be the case, but is that what you're saying? No. What I'm saying, Your Honor, is that if the Chinese government has reason to believe that someone is a Falun Gong practitioner, which in this case, again, assuming everything in the record is credible, that would describe the situation of the petitioner. The Chinese government knows that she has been either a practitioner and or supporter of Falun Gong. And if she were to set foot again in the People's Republic of China, that knowledge would still be there. And given that knowledge, given that record of pedigree that she has, in combination with the general way that Falun Gong people are treated by the Chinese government, and given the way that the Chinese prisons work, I would say, in the case of this petitioner, she clearly has a well-founded fear. She may very well face a likelihood of persecution, but I would argue that she clearly has a well-founded fear. Anything else you want to tell us? No. Any other questions? Good. Thank you, Mr. Masucci. The case was well-argued. We will take the matter under advisement. I would appreciate a five-minute break. All right. We'll take a five-minute break. Thank you. Mr. Rosen? John, is it possible you could call back on a corded phone? That might make a big difference. John, we're going to see if there's a better connection. He's going. He's having a break.